UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

THE WALMAN OPTICAL COMPANY,
a Minnesota corporation,

                    Plaintiff,

v.

QUEST OPTICAL, INC.,
a Florida corporation,

                    Defendant.

Case No. 11-CV-0096 (PJS/JJG)

MEMORANDUM OPINION
AND ORDER

---

Darren B. Schwiebert and Grant D. Fairbairn, FREDRIKSON & BYRON, P.A., for plaintiff.

Nicholas S. Kuhlmann, LEFFERT JAY & POLGLAZE, PA, for defendant.

The Walman Optical Company ("Walman") and Quest Optical, Inc. ("Quest") compete in the market for scratch-resistant coating that is applied to the lenses of eyeglasses.  In early 2011, Walman brought a patent-infringement action against Quest, alleging that two of Quest's coatings — sold under the names UVMP and UVRT — infringe several claims of U.S. Patent No. 6,100,313 (the "'313 patent"), which Walman owns by assignment.  *See* Compl. ¶¶ 7-8 [Docket No. 1]; Am. Compl. ¶¶ 7-8 [Docket No. 19].  Quest counterclaimed to invalidate the '313 patent because of inequitable conduct by the inventor during patent prosecution.  *See* Def. Answer and Countercl. [Docket No. 8].  Walman subsequently moved to dismiss Quest's inequitable-conduct counterclaim, *see* Pl. Mot. to Dismiss Countercl. [Docket No. 12], and for a preliminary injunction to prohibit Quest from "making, using, offering for sale, or selling the UVMP and UVRT products," Pl. Mot. for Prelim. Inj. [Docket No. 20].

After a lengthy hearing on Walman's motions — a hearing at which the Court expressed some skepticism about the validity of the '313 patent — the Court took the motions under advisement.  About 10 days later, Walman and Quest agreed to settle their lawsuit.  In a stipulation filed with the Court, Quest admitted that the '313 patent is valid and enforceable, and that its UVMP and UVRT coating solutions infringe the patent.  *See* Stip. for Entry of J. and Perm. Inj. at ¶ 1 [Docket No. 87].  The parties also asked the Court to enter a permanent injunction enjoining Quest from manufacturing, selling, offering to sell, importing, and using UVMP and UVRT, and from otherwise inducing infringement.  *Id.* at ¶ 2.  The Court entered the parties' proposed injunction without modification on August 31, 2011.  *See* Final J. and Perm. Inj. ("Perm. Inj.") [Docket No. 89].

Approximately two weeks later, Walman moved for an order to show cause why Quest should not be held in contempt and sanctioned for violating the injunction.  *See* Pl. Mot. to Enforce J. [Docket No. 90].  Walman alleged that Quest sold, or at least was attempting to sell, 1000 bottles of UVMP to Eye Care Centers of America ("ECCA") in violation of the injunction.[1] Walman also alleged that Quest induced infringement by encouraging its customers to continue using UVMP and UVRT.  Separately, on September 19, Walman commenced a new lawsuit against Quest and its president, Joaquin Edward de Rojas, alleging breach of the parties' settlement agreement and infringement of the '313 patent.  *See* Docket No. 1 in *The Walman Optical Company v. Quest Optical Inc. et al.*, Case No. 11-CV-2688.

---

[1]ECCA apparently changed its name to Visionworks of America, Inc.  *See* Robert Niemiec Jan. 31, 2012 Decl. [Docket No. 131].  The parties, however, continue to use the company's former name, ECCA.  For consistency, the Court will do the same.

The Court held a show-cause hearing on October 19, 2011.  At the hearing, Quest informed the Court that it had shipped 1000 bottles of UVMP directly to ECCA's warehouse in Schertz, Texas on August 23, although 125 bottles were damaged in transit.  Quest maintained that ECCA took delivery before the Court entered the injunction on August 31, and therefore the sale of the 1000 bottles of UVMP to ECCA did not violate the injunction.  Quest also informed the Court that its communications to customers about UVMP and UVRT were meant to clear up confusion about the injunction — confusion that Quest said was caused by Walman's aggressive and misleading dissemination of information about the injunction.  Because the factual record was incomplete — especially with respect to whether Quest had in fact sold the 1000 bottles of UVMP before the Court entered the injunction — the Court declined to hold Quest in contempt at that time.  But the Court permitted the parties to take limited discovery on the question of whether Quest had sold, or offered to sell, UVMP and UVRT (or otherwise induced infringement) in violation of the injunction.  *See* Order Oct. 20, 2011 [Docket No. 106].

This matter is before the Court on Walman's renewed motion to hold Quest in civil contempt.  *See* Pl. Supplemental Mot. for Sanctions [Docket No. 126].  Walman alleges that Quest violated the injunction by selling 80 bottles of UVMP to ECCA on September 1, 2011, and by inducing infringement through its continued promotion of UVMP and UVRT.  Walman seeks $24,000 in compensatory damages plus $223,788.20 in attorney's fees and costs.

The Court grants Walman's motion in part and denies it in part.  For the reasons stated on the record at the February 27, 2012 hearing, the Court does not hold Quest in contempt for truthfully communicating with customers and potential customers about the status and

consequences of this litigation.[2]  Those communications may have violated Quest's settlement

agreement with Walman — that is a matter to be decided in the later-filed action — but those

communications did not violate the August 31 injunction.  The Court does, however, hold Quest

in contempt for its sale of 80 bottles of UVMP to ECCA in September.  But because Walman has

not established that it suffered any harm due to the violation, the Court denies Walman's request

for compensatory damages.  Moreover, because the request for attorney's fees that Walman has

submitted is grossly excessive, the Court awards only a small fraction of the fees and costs

sought by Walman.

## I. FINDINGS OF FACT

Walman and Quest agreed to settle their patent-infringement suit on August 23, 2011.  On

the same day, de Rojas (Quest's president) contacted Rick Lee (ECCA's Manager of Quality

Operations) to inform him that Walman and Quest were preparing to settle their lawsuit and that,

after the settlement, Quest would no longer be able to sell UVMP.  Lee Dep. 14-15.[3]  De Rojas

suggested that ECCA issue a blanket purchase order for most of Quest's remaining inventory of

UVMP.  Lee Dep. 15, 55.  De Rojas told Lee that Quest would arrange to have an independent

agent in San Antonio store the coating solution in a refrigerated storage facility, and that ECCA

---

[2]Although the Court found that Quest did not induce infringement in violation of the injunction by truthfully communicating about this litigation, the Court also noted that Quest's website continued to prominently feature the infringing UVMP and UVRT products, and the Court suggested that any reference to those products be removed from the website.  Quest accepted the Court's suggestion and removed all references to UVMP and UVRT from its website.  *See* J. Edward de Rojas Mar. 9, 2012 Decl. ¶ 2 [Docket No. 155].

[3]A full transcript of Rick Lee's deposition was delivered to the Court, although only excerpts of the transcript were filed on CM/ECF.  The Court will cite to the full transcript without referring to the docket entry on CM/ECF.

could obtain the UVMP from the agent whenever it needed coating solution and then pay Quest accordingly.  Lee Dep. 23-24.

Lee agreed to this arrangement and instructed Victor Roig, a supply supervisor at ECCA, to issue to Quest a blanket purchase order for 1000 bottles of UVMP at a cost of $300,000.  *See* Lee Dep. 15, 56; *see also* Victor Roig Jan. 27, 2012 Decl. ¶¶ 2-3 ("Roig Decl.") [Docket No. 130].  Lee estimated that this was a six-month supply of coating solution for ECCA.  Lee Dep. 16.  Roig prepared and sent the blanket purchase order to Quest later that day.  Roig Decl. Ex. 1.  The blanket purchase order contained the following specifications: a description of the product (UVMP-Tintable UV Hard Coating "Maximum Protection"); a quantity (1000); a unit (4-ounce bottle); a unit price ($300); and a total price ($300,000).  Roig Decl. Ex. 1.[4]  ECCA typically purchased only enough coating to last it one to two weeks.  *See* Robert Niemiec Jan. 31, 2012 Decl. ¶¶ 9, 17 ("Niemiec Decl.") [Docket No. 131]; *see also* Roig Decl. ¶ 2.  Neither Lee nor his boss, Robert Niemiec (Senior Vice President of Manufacturing), had the authority to purchase $300,000 worth of UVMP at one time.  *See* Lee Dep. 17; Niemiec Decl. ¶ 9.

After receiving the blanket purchase order, Quest sent 1000 bottles of UVMP (packaged in 8 boxes of 125 bottles each) from its headquarters in Florida to ECCA's warehouse in Schertz, Texas (a suburb of San Antonio).  *See* John Healy Feb. 15, 2012 Decl. ¶ 3. ("Healy Decl.") [Docket No. 144].  One of the eight boxes, however, was damaged in transit.  *Id.*

On the morning of August 29, de Rojas emailed Roig to tell him that Quest had accidently shipped a box to ECCA that should have been shipped to his son (Jeff de Rojas) at

---

[4]The blanket purchase order incorrectly stated the "P.O. Date" as "10 June 2009."  There is no dispute, however, that Roig prepared and sent the blanket purchase order to Quest on August 23, 2011.

CW Floors in San Antonio.  *See* Roig Decl. ¶ 4, Ex. 2.  Minutes later, de Rojas sent Roig another

email in which he informed Roig that he had sent more than one box by mistake, and that those

boxes contained "floor cleaning solution" for CW Floors.  Roig Decl. Ex. 3.  Later that

afternoon, Federal Express delivered seven boxes to ECCA's warehouse.  Based on de Rojas's

emails, Roig believed that the boxes contained floor-cleaning solution intended for de Rojas's

son.  Roig. Decl. ¶ 5.  Roig then emailed de Rojas to tell him that "the 7 boxes arrived."  Roig

Decl. Ex. 3.  De Rojas responded: "OK, thanks Victor."  *Id.*

De Rojas admits that he did not tell *Roig* that the seven boxes in fact contained

875 bottles of UVMP, but de Rojas alleges that he told *Lee* about the true contents of the boxes.

Nicholas Kuhlmann Feb. 15, 2012 Decl. Ex. Q at 11 ("Kuhlmann Ex. Q") [Docket No. 138].

Lee denies that he knew that the boxes contained UVMP.  Lee Dep. 29, 71-72.  The seven boxes

of UVMP were left unopened on ECCA's loading dock.  Roig Decl. ¶ 6; Lee Dep. 28-29.  Roig

put several signs on the boxes, advising ECCA employees that the boxes did not belong to

ECCA and that they should not be opened.  Roig Decl. ¶ 6; Lee Dep. 28-29.

On September 1 — the day after the Court entered the injunction — Roig sent Quest

three purchase orders for a total of 60 bottles of UVMP.  *See* Roig Decl. ¶ 7.  Each of the three

purchase orders contained different shipping instructions:  20 bottles were designated for next-

day air; 20 were for second-day air; and the last 20 were for ground delivery.  *See* Roig Decl.

Ex. 4.  These three purchase orders made no reference to the earlier blanket purchase order.

Upon receiving the purchase orders, John Healy, Quest's customer-service manager, arranged for

80 bottles of UVMP from Quest's remaining supply to be hand-delivered to ECCA.  *See* Healy

Decl. ¶ 4.  Roig accepted delivery of the 80 bottles on September 2 and locked the bottles in his

office, which was ECCA's customary practice.  Roig Decl. ¶ 8.  Roig then issued another

purchase order to Quest for the additional 20 bottles of UVMP that had been delivered.  Roig

Decl. ¶ 8, Ex. 5.

Of course, while Roig was ordering and Quest was delivering 80 bottles of UVMP, seven

boxes containing 825 bottles of UVMP were sitting on ECCA's loading dock.  Those boxes

remained unopened on ECCA's loading dock until September 7, when Mike Keating, who was a

current or former employee of Quest, picked them up.  *See* Roig Decl. ¶ 9; Niemiec Decl. ¶ 15;

*see also* Kuhlmann Ex. Q at 12.  Keating delivered the boxes to the GFP Group, a construction

company that was located in San Antonio and that was owned by the father of de Rojas's

daughter-in-law.  *See* Darren Schwiebert Feb. 20, 2012 Decl. Ex. L at 55 ("Schwiebert Ex. L")

[Docket No. 147].  The GFP Group then arranged for the UVMP to be kept in a refrigerated

storage facility in San Antonio.  *See* Nicholas Kuhlmann Feb. 15, 2012 Decl. Ex. J. [Docket

No. 135].

On September 15, Quest sent ECCA a single invoice for 80 bottles of UVMP.  *See* Roig

Decl. Ex. 6.  The invoice did not identify any particular purchase order.  Instead, the description

column of the invoice contained a reference to "8 boxes, 125 bottles per box, 40 lbs per box."  *Id.*

Roig requested that Quest use a separate invoice for each of the four purchase orders that he had

issued.  Roig. Decl. ¶ 12, Ex. 8.  Roig also asked Quest to remove the reference to "8 boxes, 125

bottles per box, 40 lbs per box."  *Id.*  Quest complied and submitted four separate invoices —

each for 20 bottles — that did not refer to the 8 boxes.  Roig Decl. ¶ 13, Ex. 9.  ECCA paid

Quest approximately $24,000 for the 80 bottles in October.  *See* Nicholas Kuhlmann Feb. 15,

2012 Decl. Ex. L [Docket No. 135].

## II.  ANALYSIS

### A.  Legal Standard

A party bringing a motion for civil contempt bears the initial burden of establishing a

violation of a court order by clear and convincing evidence.  *Chicago Truck Drivers v. Bhd.*

*Labor Leasing*, 207 F.3d 500, 505 (8th Cir. 2000).[5]  Once a violation has been established, the

burden shifts to the non-movant to show "an inability to comply."  *Id.*  In order to prevail on an

inability-to-comply defense, the non-movant must demonstrate (1) that it was unable to comply,

"explaining why categorically and in detail"; (2) that its inability to comply was not "self-

---

[5]The United States Court of Appeals for the Federal Circuit has exclusive jurisdiction over an "appeal from a final decision of a district court of the United States . . . in any civil action arising under . . . any Act of Congress relating to patents . . . ."  28 U.S.C. § 1295.  Because this case is a patent-infringement action, it appears that any appeal of this Court's contempt order would be to the Federal Circuit.

But in matters that "are not unique to patent law" — including some (but not all) civil-contempt proceedings — the Federal Circuit applies the law of the regional circuit.  *See Eagle Comtronics, Inc. v. Arrow Commc'ns Labs., Inc.*, 305 F.3d 1303, 1313 (Fed. Cir. 2002); *compare Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 903 F.2d 1568, 1578 (Fed. Cir. 1990) (applying Fourth Circuit law to vacate a $2 million fine in a civil-contempt proceeding as being impermissibly punitive) *with TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 881 (Fed. Cir. 2011) (en banc) (applying the Federal Circuit's "more-than-colorable-differences" test in a civil-contempt proceeding to determine whether the defendant's new device continues to infringe).

Here, the only question before the Court is whether Quest sold, or offered to sell, UVMP after the Court enjoined its sale.  Because this question is "not unique to patent law," the Court will rely on Eighth Circuit decisions regarding civil contempt.  In so doing, the Court will follow the lead of the parties, both of whom relied on Eighth Circuit decisions in their briefs.

In any event, the relevant case law of the Eight Circuit appears to be similar to the relevant case law of the Federal Circuit.  Both circuits require a party who moves to hold another party in civil contempt to establish a violation of a court order by clear and convincing evidence.  *See Preemption Devices, Inc. v. Minn. Mining & Mfg. Co.*, 803 F.2d 1170, 1173 (Fed. Cir. 1986); *Chicago Truck Drivers*, 207 F.3d at 505.

induced"; and (3) that it "made in good faith all reasonable efforts to comply." *Id.* at 506 (internal quotations and citations omitted).

## B.  *The September Sale of UVMP*

On August 31, 2011, the Court entered an injunction that, among other things, prohibited Quest from "making, using, importing, offering to sell or selling [UVMP]."  *See* Perm. Inj. at ¶ 1. One day later, on September 1, ECCA sent Quest three purchase orders for 60 bottles of UVMP. *See* Roig Decl. ¶ 7.  Upon receiving those orders, Quest arranged for 80 bottles of UVMP to be hand-delivered to ECCA.  *See* Healy Decl. ¶ 4.  ECCA took delivery of those bottles on September 2.  Roig Decl. ¶ 8.  Two weeks later, Quest sent ECCA invoices for the 80 bottles of UVMP, and ECCA subsequently paid Quest approximately $24,000.  *See* Roig Decl. Exs. 6, 9; *see also* Kuhlmann Decl. Ex. L.  Each step in this transaction occurred *after* the date of the injunction.  On its face, then, this transaction appears to represent a blatant violation of this Court's injunction.

Quest insists, though, that it did not violate the injunction, because the September transaction was not a *sale* of UVMP, but rather a *delivery* of UVMP that had already been sold to ECCA before the injunction was entered on August 31.  *See* Def. Mem. Opposing Sanctions at 20-21 ("Def. Opp. Mem.") [Docket No. 134] ("The most reasonable conclusion is that ECCA was not intending to knowingly circumvent the Court's injunction by placing the purchase orders, but rather, it was merely seeking delivery from an independent agent of previously purchase[d] UVMP pursuant to the August 23 Blanket Purchase Order.").  According to Quest, ECCA purchased 1000 bottles of UVMP on August 23 when it sent Quest the blanket purchase order.  ECCA took delivery of 875 bottles of UVMP on August 29, says Quest, when seven

boxes of UVMP were delivered to its warehouse.  Quest contends that the 80 bottles that it delivered to ECCA on September 2 were replacements for the 125 bottles that had been damaged in transit.  Therefore, according to Quest, no violation of the Court's injunction occurred because ECCA already owned the 80 bottles of UVMP that Quest delivered to it.

Quest's argument fails for two primary reasons:  First, the evidence is clear that, although Quest later tried to connect the September transaction to the August 23 blanket purchase order, the one had nothing to do with the other.  Second, the evidence is also clear that ECCA did not *purchase* 1000 bottles of UVMP before the Court entered the injunction on August 31.  Rather, ECCA merely said that it *intended* to purchase 1000 bottles of UVMP from Quest in the future. Therefore, even if ECCA and Quest intended for the September purchase orders to "draw off" of the earlier blanket purchase order as Quest alleges, Quest nevertheless sold UVMP to ECCA after August 31 in violation of the injunction.

As to the first point:  In its memorandum, Quest argues that the September transaction was meant to "draw off" of the earlier blanket purchase order.  *See* Def. Opp. Mem. at 20.  To support this contention, Quest cites Lee's deposition testimony in which he stated that he intended to order the UVMP described in the blanket purchase order over a six-month period. *See* Lee Dep. 67.  But regardless of what Lee may have intended to do with respect to *future* purchase orders, Lee said that he had nothing to do with the *September* purchase orders, and there is no evidence that Lee or anyone else at ECCA connected the September purchase orders to the earlier blanket purchase order.  *See* Lee Dep. 88 ("Victor [Roig] initiated them, and I told you initiated them from Bob [Niemiec], I believe, that day.  I don't recall exactly what happened that

day . . . [b]ecause I wasn't there.").[6]  In fact, Lee repeatedly testified that he *did not know* whether

the September purchase orders — which, again, he said he had no involvement in issuing —

were related to the earlier blanket purchase order:

> Q:    [W]as it ECCA's understanding that they were drawing off
>        of the thousand bottles when they — when they made these
>        purchase orders?
>
> A:    I don't know.
>
> Q:    And when I say the thousand bottles, I'm talking about the
>        blanket PO.
>
> A:    I don't know.  I don't recall these.  I don't know how they
>        were ordered, and I don't know what conversation Bob
>        Niemiec had with Victor over these.
>
> . . .
>
> Q:    Okay.  But it's your understanding that these purchase
>        orders are connected in some way to the blanket purchase
>        order?
>
> A:    I don't know.
>
> Q:    Isn't that what you just said?
>
> A:    I don't know.
>
> Q:    You don't know for sure?
>
> A:    No, I don't know for sure.
>
> Q:    But it's possible?

---

[6]Lee initially testified that Roig issued the purchase orders at Niemiec's request, but later
explained that Roig had the authority to issue purchase orders himself.  *See* Lee Dep. 88-89.
Roig contends that Lee instructed him to send the September 1 purchase orders.  *See* Roig Decl.
¶ 7.  Regardless of who initiated the orders, there is no evidence that they were related to the
earlier blanket purchase order.

A:      I don't recall.

Q:      But do recall that Quest couldn't sell UVMP after
        August 23rd?

A:      Correct.

Q:      Okay.  So isn't it reasonable to assume that this had some
        connection to the blanket purchase order that had already
        been placed?

A:      I don't recall.

Lee Dep. 90-91 (counsels' objections omitted).

Quest's position that ECCA "was merely seeking delivery from an independent agent of previously purchase[d] UVMP," Def. Opp. Mem. at 20-21, is also inconsistent with other evidence in the record.  Most tellingly, ECCA did not contact an independent agent for delivery of UVMP.  Rather, Roig sent purchase orders directly to Quest.  In the email that he sent to Quest with the purchase orders, Roig wrote: "I need to request some coating.  Use PO's attached and follow the different shipping instructions."  Roig. Dec. Ex. 4.  Neither Roig's email nor the purchase orders that were attached to the email made any mention of an independent agent or the earlier blanket purchase order.

Of course, when Quest invoiced ECCA for the purchases on September 15, Quest tried to tie those purchases to the blanket purchase order.  *See* Roig Decl. Ex. 6.  Specifically, Quest added a reference to "8 boxes, 125 bottles per box, 40 lbs per box" to its invoice.  *Id.*  But Roig insisted that that reference be removed, which is compelling evidence that ECCA did *not* connect the September purchases to the blanket purchase order.  Roig Decl. ¶¶ 12-13.  In short, the Court

finds by clear and convincing evidence that the September transaction involving 80 bottles of UVMP was not related to the earlier blanket purchase order.

As to the second point:  Quest argues that any post-August 31 "delivery" of UVMP to ECCA (either from itself or from the GFP Group) would not represent a "sale" because ECCA had already purchased 1000 bottles of UVMP when it issued the blanket purchase order on August 23 and, therefore, already owned those bottles.  ECCA disagrees.  According to ECCA, when it issued the blanket purchase order on August 23, it was merely representing that it intended to purchase 1000 bottles of UVMP in the future; it was not actually purchasing the product.  The Court credits ECCA's position for a number of reasons.

To begin with, the evidence is undisputed that neither Lee nor his boss, Niemiec, had the authority to buy 1000 bottles of UVMP at a cost of $300,000 at one time.  *See* Lee Dep. 17; Niemiec Decl. ¶ 9 ("Neither Victor Roig, Rick Lee nor I would have had the authority on behalf of the company to purchase $300,000 of coating solution.").  Consistent with this lack of authority, Lee testified that the purpose of the blanket purchase order "was just to tell [de Rojas], okay, I'm going to purchase up to a thousand bottles from you over the next six months."  Lee Dep. 57.  Lee also testified that, when he asked Roig to send the blanket purchase order, he told Roig to tell Quest that "our intention is to purchase up to a thousand bottles of coating over the next six months."  Lee Dep. 56.  Telling someone that you *intend* to buy his product is not the same thing as *buying* his product.[7]

---

[7]Lee testified that ECCA sometimes used blanket purchase orders to give vendors a forecast of how much of a certain product ECCA planned to use so that the vendors "could keep certain products in stock for [ECCA]."  Lee. Dep. 50.

Moreover, as the Court pointed out at the hearing, if ECCA had already purchased and therefore owned the 1000 bottles of UVMP (as Quest alleges), then ECCA would have had no reason to continue sending purchase orders to Quest.  Similarly, if Quest had already sold the UVMP to ECCA, Quest would have no reason to continue sending invoices to ECCA seeking payment.  After all, buyers don't usually issue purchase orders for things that they already own, just as sellers don't usually send invoices for things that they have already sold.

Quest responds that there is nothing unusual about a buyer and a seller agreeing that the buyer can delay payment for goods that the buyer has already purchased.  *See* Def. Opp. Mem. at 21 ("delayed payment for previously made sales is a common occurrence in the business world").  That is undoubtedly true, but in that situation the buyer typically does not continue to send purchase orders for goods that it already possesses, and the seller typically does not continue to send invoices for goods that it has already sold.  Moreover, in the typical buy-now-pay-later situation, there is no doubt that the buyer must pay the full purchase price, even if the buyer never uses the product.  Here, though, Lee (the person with whom de Rojas negotiated) refused to say whether ECCA would have to pay Quest for all 1000 bottles of UVMP referenced in the purchase order, even if ECCA did not use them.  Instead, Lee testified that he had never considered the question.  Lee Dep. 19-20.[8]  The apparent lack of agreement between de Rojas (on behalf of Quest) and Lee (on behalf of ECCA) about whether ECCA would be required to pay for any UVMP that it did not use is evidence that ECCA did not own the 1000 bottles of UVMP before the Court entered the injunction.

---

[8]With respect to ECCA's blanket purchase orders for other products, Lee testified that ECCA only paid for the products that it used.  *See* Lee Dep. 51 ("I paid for it as I used it. Whatever I used, I paid for.").

Although its briefing is a little unclear, Quest also appears to argue that ECCA should be deemed to have purchased at least 875 bottles of UVMP because it accepted delivery of those bottles on August 29.  This argument is completely without merit.  Lee and Roig each declared under oath that they did not know that the seven boxes that were delivered to ECCA's warehouse on August 29 contained UVMP.  Roig Decl. ¶ 5 ("No one ever indicated to ECCA that the boxes contained anything other than 'floor cleaning solution' that was intended to be delivered to Jeff de Rojas."); *see also* Lee Dep. 29, 71-72.  The Court credits Lee's and Roig's testimony for a number of reasons:

First, it is undisputed that de Rojas emailed Roig on the morning of August 29 to tell him that Quest had "accidentally" shipped a box to ECCA that was intended for his son.  *See* Roig Decl. ¶ 4, Ex. 2.  This was untrue.  Minutes later, de Rojas sent Roig another email in which he informed Roig that he had sent more than one box by mistake, and that those boxes contained "floor cleaning solution" for his son's company.  Roig Decl. ¶ 5, Ex. 3.  This, too, was untrue.  De Rojas was probably lying to Roig, but whether he was or not, his emails misled Roig about the contents of the boxes.

Second, it is ECCA's custom and practice to keep coating solution such as UVMP under lock and key.  *See* Roig Decl. ¶ 8 (explaining that UVMP is locked in his office and that, "[b]ecause the product is expensive, only Shift Leads are authorized to access it, and they must sign a log when any of the product is removed").  Consistent with this customary practice, Roig locked the 80 bottles of UVMP that Quest delivered to ECCA on September 2 in his office.  *Id.* Given the care that ECCA takes to protect the coating solution that it purchases, it is inconceivable that Roig and Lee would knowingly allow 875 bottles of UVMP to sit unprotected

on their loading dock for several days.  As Lee testified:  "I mean, I lock up ten bottles.  Why am I going to keep a thousand bottles sitting on a loading dock?"  Lee Dep. 74; *see also id.* at 65 ("I would not leave $250,000 worth of coating sitting on loading docks.").  The fact that the seven boxes sat unprotected on ECCA's loading dock for several days strongly corroborates Lee's and Roig's testimony that they did not know that the boxes contained UVMP.

Third, UVMP is supposed to be refrigerated in order to maximize its shelf-life.  In fact, de Rojas says that he suggested that the UVMP be refrigerated rather than be stored in ECCA's hot and humid warehouse.  *See* J. Edward de Rojas Oct. 3, 2011 Decl. ¶ 7 [Docket No. 98] ("Because of the large volume of bottles to be delivered and the warm temperature in ECCA's warehouse, I suggested that the coating be stored on behalf of ECCA in a separate, refrigerated location, to extend the coating's shelf-life by preventing thickening of the coating due to humidity in the air.").  It is highly unlikely that Lee or Roig would have let hundreds of bottles of UVMP sit unrefrigerated on ECCA's loading dock.  *See* Lee Dep. 74 ("But I did not know that a thousand bottles were sitting on my loading dock for two weeks, by the way, which was nonrefrigerated, which was the biggest concern to begin with . . . . If I'd known, I'd been calling right away, saying, Hey, get this stuff out of here.  Get it refrigerated or something.").  Again, the fact that the seven boxes sat on ECCA's unrefrigerated loading dock (in Texas, in August) for several days strongly corroborates Lee's and Roig's testimony that they did not know that the boxes contained UVMP.

Finally, if Lee and Roig had known that there were 875 bottles of UVMP sitting on their loading dock, why would Roig have sent Quest three purchase orders for 60 bottles of UVMP on September 1, designating three different methods of delivery?  Roig could just have walked to

the loading dock, opened a box, and helped himself to whatever he needed.  *See* Lee Dep. 35 (explaining that ECCA would not have ordered 60 bottles of UVMP if it had known that there were over 800 bottles sitting in its warehouse).  For these reasons, the Court rejects Quest's argument that ECCA took delivery of 875 bottles of UVMP on August 29.

In sum, the Court finds, by clear and convincing evidence, that the August 23 blanket purchase order was nothing more than a clumsy attempt to evade the impending injunction. Quest wanted to sell its remaining inventory of UVMP, and ECCA wanted to buy a six-month supply.  But there was a problem:  ECCA was either unwilling or unable (or both) to buy 1000 bottles of UVMP for $300,000 at one time.  Therefore, de Rojas (on behalf of Quest) and Lee (on behalf of ECCA) devised an arrangement under which ECCA would issue a blanket purchase order for 1000 bottles of UVMP; Quest would send those bottles to the GFP Group (a company owned by de Rojas's daughter-in-law's father); and the GFP Group would deliver the UVMP to ECCA as needed.  Pursuant to this arrangement, ECCA would continue to send purchase orders to Quest; Quest would continue to send invoices to ECCA; and ECCA would continue to pay those invoices as they were received.  Except for the involvement of the GFP Group, this arrangement did not differ in any material respect from the way that ECCA and Quest had always done business.  *See* Lee Dep. 91-92 ("We were still going to order UVMP the same way we had already ordered before.  Quest was the one who was going to be sending it to me from the other person.").  Because ECCA had only expressed an intention to purchase 1000 bottles of UVMP — but had not actually purchased the bottles — prior to the Court's entry of the injunction on August 31, the September transaction represented a sale of UVMP by Quest in violation of the injunction.

Having determined that Quest violated the injunction by selling 80 bottles of UVMP to

ECCA in September, the Court must now determine the appropriate sanction.

### C.  Sanctions

A civil-contempt sanction may be imposed "either to coerce . . . compliance with a court

order or to compensate the complainant for losses sustained, or both." *Chicago Truck Drivers*,

207 F.3d at 505 (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04

(1947)).  "When a sanction is designed to coerce a recalcitrant party to comply, the sanction

should be payable to the court, rather than to the opposing party." *See Chaganti & Assocs., P.C.

v. Nowotny*, 470 F.3d 1215, 1224 (8th Cir. 2006).  But when compensation is intended, the court

may order that a fine be paid to the complainant, although the amount of the fine "must of course

be based upon evidence of complainant's actual loss." *United Mine Workers of Am.*, 330 U.S. at

304; *see also In re Chase & Sanborn Corp.*, 872 F.2d 397, 401 (11th Cir. 1989) ("If the fine is

compensatory, it is payable to the complainant and must be based on proof of the complainant's

actual loss.").  A civil-contempt sanction, however, must not be punitive.  *See United Mine

Workers of Am. v. Bagwell*, 512 U.S. 821, 830-31 (1994); *see also United States v. Hefti*, 879

F.2d 311, 315 (8th Cir. 1989) ("It is an elementary rule that in civil contempt the sanctions are

coercive (to encourage compliance), not punitive."); *In re Fannie Mae Sec. Litig.*, 552 F.3d 814,

823 (D.C. Cir. 2009) (explaining that "civil contempt sanctions may not be punitive — they must

be calibrated to coerce compliance or compensate a complainant for losses sustained").

### 1.  Coercing Future Compliance

At the civil-contempt hearing, the Court informed Quest that it believed that Quest, not

ECCA, owned the 875 bottles of UVMP that were stored in a public storage facility under the

GFP Group's name.  Because Quest was no longer permitted to sell that UVMP, the Court suggested that Quest arrange for those bottles to be delivered to Walman so that both the Court and Walman could be assured that Quest would not sell them to another customer.  That, in turn, would make it unnecessary for the Court to impose sanctions to ensure that Quest would not again violate the injunction.

Following the hearing, the Court ordered Quest to file and serve an affidavit that either "(a) states that it has delivered, or has made arrangements for the delivery of, the 875 bottles of the UVMP product to Walman; or (b) describes the reasons why it has not done so."  Order Feb. 27, 2012 at ¶ 1 [Docket No. 153].  Quest chose to send the UVMP to Walman.  On March 9, de Rojas filed an affidavit in which he declared that "Quest has made arrangements for the 875 bottles . . . to be sent to Walman's counsel" and that "the bottles should arrive in Minneapolis . . . next week."  J. Edward de Rojas Mar. 9, 2012 Decl. ¶ 3 [Docket No. 155].  So far, so good. A few days later, however, de Rojas filed a supplemental affidavit, stating that Quest could not send the UVMP to Walman because its Federal Express account number had been cancelled due to non-payment.  J. Edward de Rojas Mar. 13, 2012 Decl. ¶ 2 [Docket No. 156].  De Rojas further declared that Quest could not afford to pay the $875 that it would cost to ship the bottles to Walman.  *Id.* ¶ 3.

According to de Rojas, Quest's attorney contacted Walman's attorney and requested that Walman pay the $875 delivery fee.  *Id.* ¶ 5.  Inexplicably, however, Walman — which had incurred *hundreds of thousands of dollars* to stop Quest from selling UVMP — refused to pay *$875* to ensure that Quest's remaining supply of UVMP would be destroyed.  Instead of paying the $875, Walman paid its attorneys to write a letter to the Court, complaining that de Rojas was

still trying to convince ECCA to take delivery of those 875 bottles of UVMP.  *See* Letter to

District Court dated March 13, 2012 [Docket No. 157].  In short, Walman chose to complain

about de Rojas's conduct rather than pay $875 to do something about it.

The Court then issued another order, this time requiring Quest to file and serve an

affidavit that either "(a) states that it has destroyed the 875 bottles of the UVMP product stored in

San Antonio, Texas, and explains exactly when and how those 875 bottles were destroyed; or

(b) describes the reasons why the 875 bottles have not been destroyed."  Order Mar. 14, 2012 at

¶ 1 [Docket No. 158].  On the day that Quest's affidavit was due, de Rojas filed an affidavit

stating that, although he had located a vendor to take and destroy the UVMP, the vendor had not

provided Quest with a written quote for the cost of disposal.  *See* J. Edward de Rojas Mar. 21,

2012 Decl. ¶ 5 [Docket No. 165].

Growing weary of de Rojas's game playing, the Court finally ordered de Rojas to either

personally appear before the Court with the 875 bottles of UVMP or, in the alternative, file an

affidavit stating that the bottles have been destroyed.  *See* Order Mar. 22, 2011 [Docket No. 166].

De Rojas then filed two affidavits, confirming that the 875 bottles of UVMP were destroyed by

Gruene Environmental Companies, a hazardous-waste-disposal company located in New

Braunfels, Texas.  *See* J. Edward de Rojas Mar. 27, 2012 Decl. [Docket No. 169]; J. Edward de

Rojas Mar. 28, 2012 Decl. [Docket No. 172].

At this point, there is no evidence that Quest has any more UVMP left in its inventory,

and no evidence that Quest is continuing to manufacture UVMP.  Accordingly, the Court

concludes that a coercive fine (that is, a fine payable to the Court) is not needed to ensure future compliance with the injunction.[9]

### 2. Compensatory Damages

Walman seeks compensatory damages in the amount of $24,000, which represents the amount of money that Quest received from ECCA for its sale of 80 bottles of UVMP. But, as noted above, compensatory damages must be based upon evidence of the complainant's actual loss. *United Mine Workers of Am.*, 330 U.S. at 304. Here, Walman has not introduced evidence that it suffered *any* loss due to Quest's sale of 80 bottles of UVMP to ECCA, much less that it suffered a loss of $24,000. Therefore, the Court denies Walman's request for compensatory damages.[10]

### 3. Reasonable Attorney's Fees and Costs

Courts also have the discretion to award reasonable attorney's fees and costs to a party who has successfully moved to have another party found in contempt. *See Hartman v. Lyng*, 884 F.2d 1103, 1107 (8th Cir. 1989) ("Reimbursement may include expenses reasonably incurred in the prosecution of the contempt proceeding."). Under Eighth Circuit precedent, the Court may

---

[9]The Court also notes that, even if Quest still has some UVMP left in its inventory, it is unlikely that Quest will be able to find a buyer for the product, given Walman's aggressive circulation of the Court's injunction among the relatively small number of companies who purchase scratch-resistant coating solution.

[10]The Court notes that there appears to be a split of authority over whether a contemnor's profits may be the proper measure of compensation in a civil-contempt proceeding. *Compare Nat'l Drying Mach. Co. v. Ackoff*, 245 F.2d 192, 194 (3d Cir. 1957) (en banc) (not permitting profits to be the measure of damages) *with Connolly v. J.T. Ventures*, 851 F.2d 930, 934 (7th Cir. 1988) (permitting disgorgement of profits as a civil-contempt sanction). The Eighth Circuit does not appear to have directly addressed this issue. Because Walman did not specifically ask the Court to disgorge Quest's profits, the Court need not address this question, which (in any event) was not briefed by either party.

consider the violating party's willfulness in determining whether to award fees and costs.  *See id.*

("Although willfulness is not necessarily a prerequisite to an award of fees, it may properly be

considered in deciding whether to tax costs and attorney's fees in an action to enforce

compliance with an injunction." (internal citations omitted)); *but see King v. Allied Vision, Ltd.*,

65 F.3d 1051, 1063 (2d Cir. 1995) ("In order to award fees, the district court had to find that New

Line's contempt was willful.").

At the hearing, the Court informed the parties that it intended to award Walman some of

the attorney's fees and costs that it had incurred in connection with bringing Quest's violation of

the injunction to the Court's attention.  The Court asked Walman's counsel to file an affidavit

and appropriate supporting documents stating the amount of fees and costs that were incurred

with respect to the "sales component" of the contempt proceeding — that is, Quest's sale of

UVMP to ECCA in violation of the Court's injunction.  *See* Order Feb. 27, 2012 at ¶ 3.[11]  But

because the Court did not find that Quest had violated the injunction by truthfully

communicating to potential customers about this litigation, the Court directed Walman's counsel

to exclude fees for work that they performed in connection with the "communications

component" of Walman's contempt motion.

The Court expected that Walman would seek a relatively modest amount of fees and

costs.  After all, the conduct that gave rise to the sales component of the contempt proceeding

involved a very few people and a very short period of time.  All of the key events occurred

between August 23, 2011 (the date on which de Rojas contacted Lee about selling UVMP to

---

[11]At the hearing, the Court also informed Walman that the fees and costs that it incurred
in preparation for the earlier show-cause hearing were compensable insofar as they pertained to
Quest's sale of UVMP.

ECCA) and October 13, 2011 (the date on which ECCA paid Quest about $24,000 for 80 bottles of UVMP).  This is a span of just 52 days.  Moreover, only six individuals played a substantial role in Quest's sale of UVMP to ECCA:  de Rojas, Healy and Keating (for Quest) and Lee, Roig, and Niemiec (for ECCA).

Reflecting the modest scope of the conduct that gave rise to the sales component of the contempt proceeding, Walman's counsel — the law firm of Fredrikson & Byron ("Fredrikson") — did not need to do a lot of work to have Quest found in contempt.  Broadly speaking, Fredrikson: (1) moved to hold Quest in civil contempt and drafted two briefs in support of that motion; (2) attended a show-cause hearing on October 19, which lasted a little over an hour; (3) conducted routine, fact-based discovery on a specific and narrow question (whether Quest sold, or offered to sell, UVMP after August 31, 2011); (4) renewed its motion to hold Quest in civil contempt and drafted two more briefs; and (5) attended a second hearing on February 27, which lasted an hour and forty minutes.  Many of the most costly features of modern litigation were absent.  For example, Fredrikson did not have to review a lot of documents, there was no need to involve experts, and there was no motions practice (other than the briefing and argument of the contempt motion itself).

Based on its substantial experience in ruling on fee requests, the Court expected that Walman would seek something in the neighborhood of $25,000 in attorney's fees and maybe another $4,000 in costs.  The Court was therefore flabbergasted to receive from Walman a request for nearly a *quarter million dollars* in fees and costs.  Specifically, Walman asks this Court to order Quest — a tiny, essentially defunct company that violated an injunction by selling

$24,000 worth of coating solution — to pay $216,704.25 in attorney's fees and $7,083.95 in costs.

In support of its request, Walman relies on the affidavit of Darren Schwiebert, in which he details the number of hours that he and his partner, Grant Fairbairn, spent on the sales component of the contempt proceeding and their hourly rates. *See* Darren Schwiebert Mar. 9, 2012 Aff. ("Schwiebert Fee Aff.") [Docket No. 154]. The Court will assess the reasonableness of Walman's fee request according to the familiar "lodestar method" — that is, the number of hours reasonably expended multiplied by a reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (finding the lodestar method to be the "most useful starting point for determining the amount of a reasonable fee"); *see also AccuSoft Corp. v. Palo*, 237 F.3d 31, 60 (1st Cir. 2001) (approving of the lodestar analysis to determine the reasonableness of attorney's fees in a civil-contempt proceeding); *but see Nat'l Union Fire Ins.Co. v. Olympia Holding Corp.*, 140 Fed. Appx. 860, 864 n.1 (11th Cir. 2005) (unpublished opinion) ("Sanctions for civil contempt are not equivalent with typical payment of attorneys' fees, and civil contempt sanctions do not require the use of the lodestar method."). The Court will first determine an appropriate hourly rate for the work done by Fredrikson before turning to the reasonableness of the hours that were expended.

Fredrikson seeks an hourly rate for Walman's lead attorney, Schwiebert, of $445 for work that he performed in 2011 and $465 for work that he performed in 2012. Schwiebert Fee Aff. ¶ 9. As to Fairbairn, Fredrikson seeks an hourly rate of $345 for work that he performed in 2011 and $360 for work that he performed in 2012. *Id.* ¶ 8. Schwiebert, who has been practicing law

since 1995, and Fairbairn, who has been practicing law since 2003, are both partners in Fredrikson's Intellectual Property group. *Id.* ¶¶ 8-9.

Both Schwiebert and Fairbairn appear to be excellent lawyers. This was an extremely difficult case involving a patent for a chemical compound. The legal questions were complex, and the facts were barely comprehensible to a judge without training in science generally or chemistry specifically. The briefs submitted by Schwiebert and Fairbairn were well done, and Schwiebert did a particularly effective job at the oral argument on the preliminary-injunction motion. If Schwiebert and Fairbairn were being compensated for the difficult and highly specialized work that they did in connection with the underlying patent case, the Court would not hesitate to find that their hourly rates were reasonable.

But the question before the Court is not how much Fredrikson should be compensated for litigating the underlying patent case, but how much Fredrikson should be compensated for litigating one component of the ancillary contempt proceeding. Litigating the sales component of the contempt proceeding did not involve any infringement or validity issues — indeed, did not involve patent law at all — but rather one straightforward question: Did Quest sell, or offer to sell, UVMP or UVRT after August 31, 2011? Litigating the underlying patent case required lawyers with a sophisticated understanding of chemistry and patent law, but any reasonably competent lawyer could have litigated the question of whether Quest sold bottles of coating after August 31.

Under the circumstances, the Court expected that Fredrikson would delegate the lion's share of the work on the sales component of the contempt proceeding to a junior lawyer who billed at a relatively low rate. Yet it appears that Fredrikson chose to staff this entire contempt

proceeding — including the drafting and answering of boilerplate interrogatories, requests for admissions, and requests for production — with high-priced partners.  In fact, Schwiebert — the senior partner on the case, whose billing rate in 2012 was $465 an hour — performed more than 80 percent of the work.[12]

The rates charged by Schwiebert and Fairbairn were unreasonable for the work that they did on the sales component of the contempt proceeding.  Although it was undoubtedly necessary that at least one of them supervise the work, the vast bulk of the work could easily have been done by a junior associate.  The Court concludes that an average billing rate of $250 per hour would have been reasonable for the work done by Fredrikson on the sales component of the contempt proceeding.

Turning to the second half of the lodestar calculation — the number of hours expended — the Court concludes that the 532.2 hours for which Walman seeks reimbursement is far in excess of what is reasonable.[13]  *See Philipp v. ANR Freight Sys., Inc.*, 61 F.3d 669, 675 (8th Cir. 1995) (explaining that the party seeking fees "bears the burden of establishing an accurate and reliable factual basis for an award of attorneys' fees . . . and that the district court has wide discretion in making a fee award determination" (internal citations omitted)).[14]

----

[12]Schwiebert recorded 437.6 hours, while Fairbairn recorded 94.6 hours.  *See* Schwiebert Fee Aff. Exs. A-C.

[13]Fredrikson contends that its fee request does not include work performed by three additional attorneys (two partners and a senior associate) and its paralegals.  *See* Schwiebert Fee Aff. ¶ 5.  The Court has no idea how many hours these individuals worked on this proceeding, but if they did a significant amount of work, then this proceeding was even more over-lawyered than the Court describes.

[14]Fredrikson's time entries are divided into three categories:  work done exclusively for
(continued...)

It is important to put this contempt proceeding into perspective.  From the beginning, this has been a David-and-Goliath case, only without the Bible's twist ending.  Walman is a large, profitable company that dominates the market for eyeglass-lens coating.  Quest is a tiny, family-run business that fell on hard times after the untimely death of its founder and principal (the brother of de Rojas).  Fredrikson has long known that Quest is on the cusp of bankruptcy and therefore that Walman was not going to be able to recover much in the way of damages.  In fact, Fredrikson made exactly this point when it sought a preliminary injunction on behalf of Walman.  In describing why Walman would suffer irreparable harm in the absence of a preliminary injunction, Fredrikson explained:

> Quest has conceded that it is financially destitute.  Quest has never been profitable.  Quest's financial statements actually understate the financial situation.  With or without the [preliminary] injunction, Quest will not survive financially. . . .  Thus, granting the injunction does not cause any harm to Quest that is not already inevitable.  However, granting the injunction to Walman does stop the sales of infringing products that Quest will be unable to pay damages for at the conclusion of the trial.

Walman Reply Mem. in Support of Prelim. Inj. at 38-39 [Docket No. 74].

Since Walman and Quest settled their lawsuit last August, Quest's financial situation has only gotten worse.  Quest appears to have laid off most (if not all) of its employees and, as Fredrikson knows well from its opposition to the motions to withdraw filed by Quest's counsel, Quest has not paid its own attorneys in more than a year (owing them more than $340,000).  *See*

---

[14](...continued)
the sales component of the proceeding (Exhibit A), totaling $202,245.00; work done for both the sales component of the proceeding and Walman's separate breach-of-contract lawsuit (Exhibit B), totaling $24,640.50; and work done for both the sales and the communications components of the proceeding (Exhibit C), totaling $4,278.00.  Walman seeks half of its fees for the time entries listed in Exhibits B and C.  *See* Schwiebert Fee Aff. ¶ 4.

Leffert Jay & Polglaze Mem. in Support of Mot. to Withdraw at 2 [Docket No. 160].

Meanwhile, Walman appears to have done very well since the termination of the parties' lawsuit

and, according to Quest, has convinced many former buyers of UVMP and UVRT to convert to

Walman's coating solution.  Quest Mem. Opposing Fee Request at 2 ("Quest Fees Mem.")

[Docket No. 164].  Having pretty much put its rival out of business, it is hard to know what

Walman is trying to accomplish in its continued pursuit of what Walman itself has described as a

"financially destitute" competitor.

Given that any "victory" by Walman in this contempt proceeding would be of the pyrrhic

variety, the Court would have expected Fredrikson to be extremely sensitive about the number of

hours that it devoted to discovery and post-discovery briefing — especially since the vast

majority of those hours were being billed at rates substantially in excess of $400 per hour.  The

Court would have been mistaken.  To cite just a few examples:

- From October 5 to October 10, 2011, Fredrikson recorded 33.5 hours for "draft[ing]," "review[ing]", "revis[ing]", and "final[izing]" its reply memorandum in connection with Walman's show-cause motion.  Schwiebert recorded 32.1 hours, while Fairbairn recorded 1.4 hours.  Fredrikson's reply memorandum was only nine pages long (1,857 words).  This does not include the 10.1 hours that Fredrikson spent on October 4, analyzing and reviewing Quest's nine-page opposition memorandum and supporting documents.[15]  In other words, Schwiebert devoted a full *week* to writing a nine-page reply to a nine-page response.

- From October 28 to November 21, Schwiebert recorded 39.6 hours for "draft[ing]," "revis[ing]," "review[ing]," or "prepar[ing]" discovery requests to be

---

[15]Due to Fredrikson's practice of "block billing" — that is, billing multiple tasks under a single time entry — it is impossible for the Court to identify precisely how much time Schwiebert and Fairbairn spent on specific tasks.  For example, on October 7, Schwiebert recorded 8.1 hours with the following description:  "Review and revised reply memorandum in support of motion for contempt; review analysis of deposition testimony regarding storage of product in San Antonio."  The Court cannot tell how many hours Schwiebert spent reviewing deposition testimony and how many hours he spent revising the reply memorandum.

served on Quest.[16]  This does not include the time that Schwiebert recorded for drafting and revising Rule 30(b)(6) deposition topics, or the time that he spent responding to Quest's discovery requests.

•      From February 16 to February 20, 2012, Fredrikson spent 35.3 hours drafting its reply memorandum in connection with Walman's renewed motion for civil contempt.  This includes 28.2 hours recorded by Schwiebert and 7.1 hours recorded by Fairbairn.

•      From February 21 to February 27, Schwiebert recorded 24.6 hours — three full days — preparing for oral argument at the civil-contempt hearing.[17]

In addition, many of Fredrikson's time entries were related to work that the Court said was *not* compensable — that is, either work that was related to the communications component, or work that was related to Walman's separate breach-of-contract lawsuit.  To cite several examples:

•      Schwiebert recorded 19.6 hours preparing Martin Bassett, Walman's president and CEO, for his deposition.  The deposition, which lasted a little over an hour,

_____

[16]Some of the time entries contain only general descriptions (e.g., "Drafted discovery regarding contempt hearing" on October 28; "Revised discovery regarding contempt hearing" on October 31; and "Review and revised discovery requests regarding contempt issue" on November 11), while other entries are more detailed (e.g. "Review and revised requests to admit; interrogatories and document requests regarding contempt issues" on November 15).  Because of the vagueness of some of Fredrikson's time entries, it is difficult for the Court to assess whether the work was reasonable or merely duplicative.  *See generally Am. Broad. Cos., Inc. v. Ritchie*, No. 08-5285, 2011 WL 665858, at *9 (D. Minn. Feb. 14, 2011) ("[M]any of the billing entries submitted . . . were overly vague, so that the Court cannot accurately evaluate the reasonableness of much of the legal research, conferences, and correspondence billed.").

[17]Again, some of the time entries contain only general descriptions (e.g., "Preparation for hearing on renewed motion for contempt" on February 21 and 24), while other time entries were more detailed (e.g., "Preparation for hearing on renewed motion for contempt, including review of Ed de Rojas deposition transcript regarding issues not addressed by Quest in its opposition memorandum regarding potential questions by Court" on February 23).

focused almost exclusively on the communications component of the proceeding.[18]

• Schwiebert recorded 21 hours preparing Joseph Mark Parker, Walman's vice president and general manager, for his deposition. Again, the deposition focused almost entirely on the communications component of the proceeding.

• On December 6, 2011, Schwiebert recorded 5.1 hours for work that was related to Quest's website. This is not compensable.

• Schwiebert recorded 19.6 hours for work that was related to whether Walman could hold Sirius Technologies LLC (a non-party) liable for Quest's violation of the injunction based on a theory of successor liability. Although this is relevant to Walman's breach-of-contract claim in its other lawsuit, it falls outside the scope of discovery for this contempt proceeding and is not compensable.

• On January 27, 2012, Fairbairn recorded 3.9 hours preparing for the deposition of Felix Castonon, a lab manager for Sunland Optical. Castonon's deposition, however, focused exclusively on the communications component of the proceeding.

Based upon the Court's considerable experience reviewing fee requests and its careful review of Fredrikson's work in connection with this contempt proceeding — and taking into account all of the non-compensable work for which Fredrikson seeks reimbursement — the Court concludes that the number of hours for which Walman seeks reimbursement is grossly excessive. *See generally Jenkins v. Missouri*, 127 F.3d 709, 716 (8th Cir. 1997) (explaining that, under the lodestar method, "services that were redundant, inefficient, or simply unnecessary are not compensable" (citing *Hensley*, 461 U.S. at 434)). The Court therefore reduces the number of

---

[18]The Court acknowledges that some of this time was recorded in connection with other work (e.g., "Preparation and meeting with M. Bassett regarding deposition preparation; review and revised 30(b)(6) deposition notice for ECCA" on January 11). But again, because of Fredrikson's block billing, it is impossible for the Court to assess how much time Schwiebert spent on compensable versus non-compensable work.

hours expended by 75 percent — that is, from 532.2 hours to 133.05 hours. By the Court's calculation, then, Walman is entitled to receive $33,262.50 in attorney's fees.

In reaching this conclusion, the Court takes comfort in the Eighth Circuit's recent decision in *McClelland v. Life Insurance Company of North America*, 679 F.3d 755 (8th Cir. 2012). In that case, the district court awarded $134,088.50 in attorney's fees to the plaintiff after determining that the Employee Retirement Income Security Act ("ERISA") plan administrator had abused its discretion by denying a claim for accidental death benefits. *Id.* at 759. Acknowledging that the case involved two rounds of cross-motions for summary judgment and dueling expert reports, the Eighth Circuit nonetheless held that the more than 500 hours expended by the plaintiff's counsel was "more than reasonably necessary" and reduced the fee award to $85,000. *Id.* at 762. If two rounds of cross-motions for summary judgment plus dueling expert reports in a complex ERISA litigation merited just $85,000 in fees, it is hard to see how the Court could award Walman over $216,000 in attorney's fees for a simple contempt proceeding that centered on whether Quest sold UVMP after August 31, 2011.

Walman also seeks to recover costs in the amount of $7,083.95. *See* Schwiebert Fee Aff. Ex. D. With the exception of the costs that were incurred to obtain transcripts of the depositions of Bassett and Parker (totaling $609.40) — depositions that dealt almost exclusively with the non-compensable communications component of the contempt proceeding — the Court approves Walman's request for costs. Therefore, Walman is entitled to recover $6,474.55 in costs.

Only two additional matters merit comment:

First, Quest argues in its briefs that the sale of 80 bottles of UVMP was, at most, a "technical" violation of the Court's injunction because Quest's employee, Healy, did not have

"actual notice" of the injunction when he arranged for the UVMP to be delivered to ECCA.  *See* Def. Opp. Mem. at 22; *see also* Healy Decl. ¶ 4.  According to Quest, this warrants a substantial reduction in the amount of fees awarded to Walman.

The Court agrees with Quest that, under Eighth Circuit precedent, whether Quest's violation of the Court's injunction was willful may be considered in determining whether to award attorney's fees.  *See Hartman*, 884 F.2d at 1107.  The Court disagrees, however, that Quest's sale of UVMP was merely a "technical" violation of the Court's injunction.[19]  The Court has already found that Quest willfully concocted a scheme to sell off its remaining inventory after August 31 in violation of the injunction.  If Walman had not brought this scheme to the Court's attention, Quest would have continued to violate the Court's order.  That the scheme was quickly discovered — and thus Quest was (for the most part) foiled in its attempt to evade the injunction — does not render Quest's violation of the injunction a mere technicality.[20]

Second, in its opposition to Walman's request for fees, Quest argues that Walman failed to disclose the fact that Schwiebert traveled to San Antonio to meet with certain employees of ECCA on January 26, 2012.  Quest Fees Mem. at 17-20.  According to Quest, Walman's answers to Quest's interrogatories led Quest to believe that the last substantive communication between Walman and ECCA occurred on December 16, 2011.  Walman's failure to supplement its

---

[19]That Healy did not have actual notice of the injunction may mean that he cannot personally be held in contempt.  But that does not mean that Quest cannot be held in contempt for the actions that Healy took on Quest's behalf.

[20]That said, the Court agrees with Quest that its violation of the injunction was not as egregious as it could have been.  For example, there is no evidence that Quest manufactured UVMP after August 31 or that Quest tried to sell UVMP to any customer other than ECCA.  But given that the Court has already substantially reduced Walman's fee request, a further reduction is not warranted.

answers, says Quest, "raises a question of impropriety and justifies an outright denial of fees and costs, if not a significant reduction."  Quest Fees Mem. at 21.

Assuming that what Quest alleges is true,[21] the Court fails to see how Quest was materially prejudiced by Walman's failure to disclose Schwiebert's meeting with ECCA.  Quest suggests that it was ambushed towards the end of discovery by Roig's and Niemiec's damaging declarations.  But Quest does not connect Schwiebert's meeting to Roig's and Niemiec's declarations.  There is no reason to believe that, but for Schwiebert's meeting, Roig and Niemiec would not have submitted declarations or would have changed the contents of their declarations.  Moreover, Quest could at any time have asked the Court to reopen discovery so that it could depose Roig and Niemiec about their declarations.  But Quest, to this day, has not done so.  Given the lack of prejudice to Quest, the Court concludes that Walman's alleged failure to supplement its answers to Quest's interrogatories does not warrant the extreme remedy of an outright denial of attorney's fees and costs.[22]

---

[21]Because Quest raised this objection in its opposition to Walman's request for fees and costs, Walman has not had the opportunity to respond to Quest's allegations.

[22]Quest did not ask the Court to ignore Roig's and Niemiec's declarations.  In a footnote, however, Quest cites Fed. R. Civ. P. 37(c)(1) for the proposition that Walman should be forced to supplement its discovery responses before the Court enters judgment in this contempt proceeding.  *See* Quest Fees Mem. at 20-21 n.4.  Rule 37(c)(1) provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or harmless."  Here, the information that was allegedly withheld was the fact that Schwiebert met with ECCA on January 26.  That information was not used to support Walman's motion.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, and for the reasons stated on the record at the civil-contempt hearing on February 27, 2012, IT IS HEREBY ORDERED THAT:

1.      The Walman Optical Company's renewed motion to hold Quest Optical, Inc. in civil contempt [Docket No. 126] is GRANTED IN PART as follows:

    a.      Quest is held in civil contempt for selling 80 bottles of UVMP to Visionworks of America, Inc. f/k/a Eye Care Centers of America, Inc. in September 2011 in violation of this Court's permanent injunction.

    b.      Quest is ordered to pay Walman's attorney's fees in the amount of $33,262.50 and Walman's costs in the amount of $6,474.55, for a total of $39,737.05.

2.      Walman's motion is DENIED in all other respects.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: August  9 , 2012                         s/Patrick J. Schiltz
                                                Patrick J. Schiltz
                                                United States District Judge